Richard PICARIELLO et al., Plaintiffs,

v.

Charles E. FENTON, Warden, et
al., Defendants.

Civ. No. 79–317.

United States District Court,
M. D. Pennsylvania.

May 7, 1980.

See also, D.C., 491 F.Supp. 1020.

Steven Ney, Washington, D. C., Edward I. Koren, Amherst, N. Y., Alvin J. Bronstein, National Prison Project, Washington, D. C., John M. Humphrey, Williamsport, Pa., Reita P. Pendry, Washington, D. C., for plaintiffs.

Harry A. Nagle, Asst. U. S. Atty., Lewisburg, Pa., Earl Kaplan, Henry E. Davis, Crim. Div., U. S. Dept. of Justice, Washington, D. C., for defendants.

## OPINION

### # 2 of May 7, 1980

MUIR, District Judge.

### I. Introduction.

Plaintiffs, 25 present and former inmates of the Federal Prison system, filed this action against 17 individual defendants pursuant to 28 U.S.C. § 1331 alleging violations of their constitutional rights. All the Plaintiffs except Plaintiff Ozgur[1] also asserted claims against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2672–2680, based on the alleged tortious conduct of the individual defendants in their capacities as employees of the United States. Plaintiffs' allegations relate to the reception afforded two busloads of prisoners at the United States Penitentiary at Lewisburg, Pennsylvania, on the evening of April 14, 1978, and, to some extent, the treatment of the Plaintiffs the following morning. Plaintiffs allege that their Eighth Amendment rights were violated by being subjected to cruel and unusual punishment, that their Fifth Amendment rights were violated in that they were subjected to summary punishment and that the United States is liable under the Federal Tort Claims Act for assaults, batteries, intentional infliction of emotional distress, negligence, and willful, wanton, or reckless conduct. The trial of the case was bifurcated as between liability and damages. The liability phase of the constitutional claims was tried between February 5, 1980 and March 13, 1980 to a jury which also acted as an advisory jury pursuant to Fed.R.Civ.P. 39(c) with respect to the claims under the Federal Tort Claims Act. The damages phase was tried April 29, 1980.

The case as to liability was submitted to the jury on the basis of 393 special verdict questions pursuant to Fed.R.Civ.P. 49(a). The jury's answers to the special verdict questions resulted in findings that Defendants Fenton and Cassella inflicted cruel and unusual punishment and summary punishment on Plaintiff Glick and that Defendants Fenton and Hudson inflicted summary punishment and cruel and unusual punishment on Plaintiff Picariello. The jury also found, however, that the Defendants acted

---

1. A footnote to Plaintiffs' brief in support of their motion to file a second amended complaint (Doc. 181) states that Ozgur is not asserting a claim against the United States because his administrative claim had not been pending for six months as required by 28 U.S.C. § 2675(a).

with a reasonable good faith belief that the actions they took were lawful. The jury made findings that plaintiff Montgomery was subjected to cruel and unusual and summary punishment but that none of the Defendants inflicted that punishment.

Following the return of the jury's answers to the special verdict questions, the Plaintiffs moved for the entry of judgment on the issue of liability against Defendants Fenton, Hudson, and Cassella on the grounds that the Defendants were not entitled to a qualified immunity as a matter of law. On April 29, 1980, the issue of damages suffered by Plaintiff Glick was tried to the Court and the advisory jury. At the same time, evidence was presented on the damages suffered by Plaintiffs Picariello and Glick as the result of the constitutional violations. This was done before the Court ruled on Plaintiffs' motion for judgment notwithstanding the verdict on the theory that if the Court denied Plaintiffs' motion, which it subsequently did in opinion and order # 1 of this day. *Picariello v. Fenton*, 491 F.Supp. 1020, and if that decision is reversed on appeal, there will be no need for further proceedings. The jury awarded Picariello and Glick each $1.00 in damages.

The following represent the Court's findings of fact, discussion, and conclusions of law with respect to the Plaintiffs' claims filed under the Federal Tort Claims Act.

## II. Findings of Fact.

1. Each Plaintiff filed written tort claims with the Federal Bureau of Prisons. The claims filed by all the Plaintiffs except Plaintiff Ozgur were pending for more than six months when the second amended complaint was filed. Plaintiff Ozgur's claim filed August 8, 1979 was still pending when the second amended complaint was filed.

2. On April 11, 1978, Lt. Joseph Humme was told by the acting Associate Warden at the Lewisburg Penitentiary to take the Lewisburg bus to Atlanta to pick up a load of prisoners.

3. Lt. Humme knew before he left for Atlanta that the prisoners he was going to pick up in Atlanta were unusually dangerous.

4. Humme and officers Bidelspach and Wagner arrived in Atlanta at 1:30 A.M. on April 13, 1978.

5. Humme saw a list of the names of the inmates he was to transport.

6. Humme recognized some of the prisoners on the list from his prior experience in Atlanta.

7. On the morning of April 13, 1978, Humme placed restraints on the prisoners who were going to be transported on his bus after they had been strip searched.

8. The prisoners were not inspected by a metal detector by Humme or anyone else before they boarded the bus.

9. The bus with Humme in charge left Atlanta at around 10:00 A.M. on April 13, 1978 and proceeded to the federal prison in Petersburg, Virginia.

10. When the bus arrived at Petersburg on the evening of April 13, 1978, Humme was told by Officer Wagner that inmates had been out of their restraints on the bus.

11. On the evening of April 13, 1978, at Petersburg, Humme and other officers removed the prisoners' restraints with one exception.

12. Humme had to have the handcuffs cut from one prisoner because a foreign object had become jammed in the keyhole.

13. Humme learned on the following morning, April 14, 1978, that a security bar had been cut on another bus which on April 13, 1978 had been used to bring a group of prisoners from Atlanta to Petersburg.

14. Because of the discovery of the cut bar on the bus and the discovery that prisoners had unlocked or attempted to unlock their restraints on April 13, 1978, the prisoners were inspected with a metal detector before they boarded the buses on April 14, 1978.

15. Humme was told by officials at Petersburg that Wallace, a prisoner on one of the buses, concealed in his anal cavity a metal vial four inches long which contained an ice pick type instrument and file.

16. Humme's bus, Bus 1, departed from Petersburg at 11:00 A.M. en route to Lewisburg on the morning of April 14, 1978.

17. From the rear cage of the bus, en route Humme observed Plaintiff Glick who had removed his leg irons.

18. Humme also observed Glick in the process of "picking" his handcuffs.

19. Humme also observed prisoner Crouch halfway out of his leg irons.

20. Humme told the officers in the front of the bus via the bus's communication system that prisoners were out of their restraints and others were trying to get out of their restraints.

21. Humme told the other officers to call the U.S. Marshal on the bus's radio as soon as they were within range of the Marshal's Office in Harrisburg, Pennsylvania.

22. Humme requested vehicles from the Marshal's Service and a state police vehicle to escort the bus through Harrisburg.

23. During the time Humme was seeking assistance many of the prisoners were cursing him and the other officers, moving about, and otherwise misbehaving.

24. The bus was later met near Harrisburg by a car with officers from the Marshal's Service and a state police car.

25. Humme heard the sound of handcuffs being relocked when the state policemen appeared.

26. Between Petersburg and Lewisburg Humme was seriously concerned that there would be an escape attempt. Humme thought 90% of the prisoners on his bus were out of their restraints and he told this to Warden Fenton upon his arrival at Lewisburg.

27. Vernon Crouch, a prisoner in Humme's bus, was able while testifying at trial to open his handcuffs with a key fashioned from a match book cover once the cuffs were taken off deadlock.

28. The inmates on bus 1 had at least one picking device which enabled them to take the cuffs off deadlock.

29. Warden Fenton listened to the radio communications intermittently that afternoon and evening on the radio in his office.

30. Radio communications can be picked up at least 3 miles from the Lewisburg institution.

31. Fenton heard that there was trouble on the first bus.

32. Fenton and other prison officials received no word of trouble aboard the second bus before it arrived in Lewisburg.

33. After Fenton heard the report about the first bus he ordered some of the day shift to stay overtime to assist in the processing of the prisoners that night.

34. The day shift normally terminates at about 4:15 P.M.

35. On April 14, 1978, Lt. Wicka was on duty as the day shift correctional supervisor.

36. Fenton instructed Wicka to take some correctional officers and a vehicle to meet the first incoming bus, to render any assistance thought to be necessary and to escort the bus to Lewisburg.

37. This was the first time Fenton ever heard of an officer on a prison bus requesting custodial assistance in the 25 years Fenton had been with the Bureau of Prisons.

38. Fenton sent a cameraman from the penitentiary with video equipment with Wicka.

39. Wicka left Lewisburg just after 4:00 P.M., and met the bus near Harrisburg on U.S. Route 15.

40. The bus was hailed by radio by Wicka and pulled over to the side of the road. Wicka deployed officers around the bus who were armed with shotguns and pistols.

41. None of the weapons was pointed at the passengers on the bus.

42. Wicka told Humme that he understood that the inmates were removing their restraints and asked Humme whether he wanted Wicka to go with him into the bus to put the restraints back on the inmates.

43. While this discussion was going on Wicka could hear the clicking of the cuffs onto the inmates' wrists.

44. Humme decided that the bus could make it to the penitentiary.

45. Humme advised Wicka that it was no longer necessary to go into the bus and that the inmates on the bus had quieted down when they saw the officers surround the bus with shotguns.

46. Fenton knew that some of the prisoners on the buses destined for the Lewisburg Penitentiary were dangerous prisoners who had been transferred from the Atlanta Penitentiary.

47. On the afternoon of April 14, 1978, Fenton read a telegram which listed the names of prisoners who were on the buses destined for the Lewisburg Penitentiary.

48. Fenton and Capt. Roland Cassella knew most of the prisoners listed in the telegram from their prior service with the Bureau of Prisons.

49. After being informed that there were problems with the prisoners on the incoming bus Fenton began formulating plans for responding to the situation.

50. Fenton had prisoners in the Special Housing Unit placed two and three to a cell to make room for the incoming prisoners.

51. The plans formulated by Fenton for receiving the buses at the Lewisburg Penitentiary took into account the attitude and appearance of the prisoners when they arrived at the penitentiary.

52. If when the prisoners arrived at the penitentiary they appeared to be obedient, the buses were to proceed to the normal receiving area, the prisoners were to be permitted to leave the bus in the normal manner, and they were to be processed into the institution and assigned to cells.

53. If when the prisoners arrived at the penitentiary they appeared to be violent, the plan called for correctional officers to board the buses outside the wall of the penitentiary to prevent prisoners inside from rioting in sympathy with those on the bus.

54. The plan put in effect was the one based on the prisoners arriving in an apparent obedient frame of mind.

55. The plan required the creation of three squads totalling approximately 35 officers.

56. Fenton appointed Cassella, then a captain at Lewisburg, as the leader of the first squad.

57. The first squad was given the assignment by Fenton of lining both sides of the steps which lead into the receiving room.

58. Many members of the first squad wore jump suits and helmets and carried riot batons or pick handles.

59. The squad outside on the steps, at times, consisted of at least the following persons:

Warden Fenton

Captain Cassella

John Kilkeary (Undisputed fact, hereinafter U)

60. At about 6:30 P.M. on April 14, 1978 Humme's bus carrying thirty federal prisoners (Bus 1) arrived at the U.S. Penitentiary at Lewisburg, Pennsylvania. (U)

61. Among the thirty prisoners on the first bus, the following are plaintiffs in this action:

Leslie Atkinson

William Brown

Mark Cook

Raymond Esquer

Joseph Gerald

Casson Glick

Donald Hallock

John Honore

John Kurtz

Haskell Martin

Robert Larry Mayes

James Morrell

Richard Picariello

Patrick Shanahan

Ron Sheperd

Paul Solina.

62. Lt. Humme told prison officials when the bus was inside the prison and before the prisoners left the bus that all prisoners appeared to be in their restraints, and there was no problem on the bus at that time. (U)

63. The usual bus processing procedure calls for prisoners to leave the bus in one group, go into the first room, sit on benches and be searched in small groups in that room. The benches were removed on April 14, 1978. (U)

64. Fenton directed the removal of the benches because they were potential battering rams, obstacles and weapons.

65. Prison officials lined the steps and walkway leading from the bus into the basement of the segregation area where the prisoners were to be processed.

66. Most of the prison officials on the steps, and some of the officials in Rooms 1 and 2, were in standard Bureau of Prisons riot gear, which included coveralls (also known as jumpsuits), helmets, plexiglass face shields, and pick handles or riot sticks which they held in their hands.

67. Fenton, Cassella and Wicka were at the head of the squad on the steps when the prisoners left Bus 1.

68. All prisoners on the first bus appeared to be in handcuffs, and waistchains, and almost all appeared to have on leg irons when they came off the bus. (U)

69. Prison officials visually checked the restraints of the prisoners as they walked off each of the buses.

70. No prisoner was seen by any officer to be out of his restraints when he left Bus 1.

71. Some prisoners' restraints were reversed and leg chains were snarled indicating to the officers that they had been removed and resecured.

72. Prisoners walked between the two rows of correctional officers down the steps into the receiving room.

73. Fenton had the officers line the steps because in his judgment this would discourage prisoners from becoming disruptive upon leaving the buses.

74. Plaintiff Kurtz, the second person to leave Bus 1, moved toward cameraman Seebold and made a gesture and a comment. Fenton ordered John Kilkeary to escort Kurtz into Room 1 which Kilkeary did without touching him with a pick handle.

75. Fenton appointed Robert Kerstetter, a lieutenant at the penitentiary, as the leader of the second squad.

76. The assignment given the second squad was to maintain order in the first room which the prisoners entered.

77. The squad in Room 1 under the direction of Lt. Robert Kerstetter, at various times, consisted of the following persons:

Robert Geiswite

Victor Jacobsen

Roger Cronrath

Randall Noone

Thomas Kindt

Henry Augustine

John Kilkeary

James Holland

Carl Casterline

Claude Rook (U)

78. Pursuant to Fenton's orders, Kerstetter directed the prisoners to sit on the floor with their legs outstretched, face the wall, and remain silent while in the first room.

79. Prisoners aboard the first bus were seated along the walls in the first room and had to sit with their legs outstretched touching the wall and to face the wall while in their restraints. (U)

80. The prisoners were directed to sit on the floor in restraints with their legs outstretched because in Fenton's judgment this position would make it more difficult for prisoners to initiate a disturbance.

81. The prisoners were required to face the wall because in Fenton's judgment this would prevent them from using eye contact to coordinate or execute any pre-arranged plan for disruption.

82. The prisoners were required to remain silent because in Fenton's judgment this would prevent oral confrontations between inmates and staff members.

83. Fenton had no confidence in the restraints holding the prisoners and believed a riot was possible at any time.

84. Fenton had given instructions that Kerstetter was the only correctional officer who was to speak in the first room.

85. After the prisoners entered the penitentiary, the correctional officers in the first squad who were outside on the steps entered the first and second rooms.

86. Fenton had instructed Kerstetter to point to any prisoner who became disruptive or failed to obey orders while in the first room and to indicate by use of one word, such as "him" or "out," that the prisoner should be removed to the second room.

87. No prisoner in Room 1 threatened or struck any staff member.

88. Disruptive prisoners were to be taken to Room 2 and placed on the floor.

89. The disruptive prisoners were required to lie on the floor in the second room because in Fenton's judgment this position would make it more difficult for the prisoner to continue his disruptive behavior.

90. In addition, it was easier and safer to control a prisoner in that position than if he were placed in a cell.

91. In order to place a prisoner in a cell, he had to be thoroughly searched to insure that no contraband which may have been secreted on the prisoner could be concealed in the cell.

92. The prisoners who misbehaved were required to remain on the floor in their restraints until all the other prisoners on their bus were processed.

93. Fenton appointed Lowell Hudson, another lieutenant at the penitentiary, as the leader of the third squad which squad was assigned to Room 2.

94. Hudson was instructed to remove the handcuffs, waist chains, and leg irons from the prisoners in the second room.

95. The squad in Room 2 under Hudson's direction consisted of the following persons at various times:

Timothy Ferguson (U)
Ronald E. Reichenbach (U)
Terry Butler (U)
Scott Heller (U)
Brian McDermott (U)

96. Fenton did not order anyone to strike or otherwise to abuse any prisoners on April 14, 1978.

97. At a briefing, at approximately 5:00 P.M. on April 14, 1978, Fenton announced that the correctional officers would establish a show of force.

98. Fenton was the senior officer present on April 14, 1978. He was responsible for planning and implementing the processing of the prisoners arriving on the two buses from the United States Penitentiary, Atlanta, Georgia.

99. Fenton was present in both rooms and outside on the steps, overseeing and supervising the entire processing operation all evening on April 14, 1978.

100. Fenton wore a riot jumpsuit and carried a pick handle all evening.

101. Cassella was the second senior officer present during the bus processing and was second in command to Fenton. He was present and the leader of the squad on the steps when the buses arrived and was in both rooms at various times in the evening.

102. Humme was present when the prisoners left the bus. He also was present in Room 1 and Room 2 at various times during the evening. He indicated to Hudson in Room 2 which of the prisoners in his opinion had misbehaved on the bus trip.

103. Lt. Frederick Cozza was in charge of the general operation of the institution that evening, as the most senior officer on the evening shift. He was present briefly in Room 1 and Room 2 on three occasions that evening. He was also present the next morning when the restraints were put on the prisoners.

104. Mr. Robert Sinsheimer was present and carried a pick handle on the evening of April 14, 1978 in both rooms and on the steps. Sinsheimer was the Case Management Coordinator at Lewisburg on April 14, 1978.

105. On April 14, 1978 pick handles were among the riot control equipment considered acceptable by the Bureau of Prisons.

106. A pick handle is a weapon which can inflict serious or even fatal injuries.

107. William Story was Associate Warden and was present in Room 2. (U)

108. Wicka was present in both rooms and on the steps on April 14, 1978 at various times.

109. Mr. Timothy Ferguson was a Correctional Officer who was present in the second room on April 14, 1978. His assigned roles at various times were to remove restraints from prisoners and to hand out clothing.

110. Mr. Kirby Lampman was a Medical Technical Assistant who was present in Room 2 on April 14, 1978. Mr. Dan Kelly, Hospital Administrator, and M.T.A. Thomas Bell were also present. Dr. Vera Stallworth, a medical doctor employed at the penitentiary, was present at times in the hospital on the evening of April 14 but was not present on the steps or in Rooms 1 or 2.

111. Mr. Donald T. Seebold, a correctional officer, was present outside on the steps, in Room 1, and in Room 2 during the evening of April 14, 1978. He carried videotaping equipment during most of this time.

112. Seebold is trained in the taking of videotapes. He was present during the processing of the passengers in the first bus and some of the passengers in the second bus and appeared to be taking videotapes on the Lewisburg videocamera although the machine's batteries were depleted and the camera was not recording images.

113. Lt. William Scott was on duty on April 15, 1978 but not April 14, 1978. He was in charge of the processing of the inmate Plaintiffs who left Lewisburg on April 15, 1978, and placed restraints on some of the prisoners.

114. Mr. Oscar Williams was in charge of the bus used to transport certain inmates from USP Lewisburg on April 15, 1978. He placed restraints on prisoners, some of whom may be plaintiffs.

115. Raymond Geiswite was a member of the squad in Room 1. He was also present at times in Room 2 on April 14, 1978. Geiswite wore riot gear and carried a pick handle.

116. Geiswite was present on April 15, 1978 dressed in riot gear and carrying a pick handle on that date as well.

117. Geiswite participated on April 14, 1978 in the removal of at least three prisoners from Room 1 into Room 2—Mr. Evans, Plaintiff Sheeley and Mr. Michael Martinez, a non-plaintiff prisoner, now deceased.

118. Mr. Roger Cronrath on April 14, 1978 was a member of the squad in Room 1, was dressed in riot gear and carried a pick handle. Cronrath was also present at times in Room 2.

119. Cronrath was present the next morning, April 15, 1978, at which time he also wore riot gear and carried a pick handle.

120. Mr. Terry Butler on April 14, 1978 was in the squad in Room 2 and carried a pick handle.

121. Mr. John Kilkeary on April 14, 1978 was present in the segregation unit during the processing. He was on the squad on the steps when the first bus arrived. He was dressed in riot gear and carried a pick handle. He was also a member of the squad in Room 1 and was present at times in Room 2.

122. Dr. William Allen Smith who holds a doctorate of psychology was present in the segregation area when the buses arrived. Dr. Smith has only one arm and carried a night stick which had been issued by the Bureau of Prisons.

123. Mr. Ronald E. Reichenbach was a Senior Correctional Officer Specialist. He was present in the second room on April 14, 1978. His assigned roles were to remove restraints from prisoners, to hand out clothing, and to take prisoners to their cells.

124. Mr. Randall Noone was present in the segregation area on the evening of April 14, 1978 (U).

125. Both Bureau of Prisons buses were secured on April 14, 1978 when they arrived at Lewisburg by bars on all windows and locked gates inside the buses in the front

and rear. The driver and the officer sitting next to him were both armed with guns. An armed officer was also present at the rear of the bus.

126. Only one officer wore a visible name tag that evening although some officers usually wear them all the time.

127. It is sound correctional practice for officers generally to wear name tags.

128. With the exception of Plaintiffs Cook and Picariello who were on Bus 1 and Plaintiff Sheeley who was on Bus 2, all Plaintiffs were removed to Room 2 in essentially the same manner.

129. When it was time for each Plaintiff to go to Room 2, an officer either told the prisoner to stand up or tapped him lightly on the shoulder or back with a pick handle.

130. Those Plaintiffs who needed assistance were helped to their feet by one or two officers who then escorted each Plaintiff into Room 2.

131. In addition to the three designated squads of officers, there were other officers in riot gear in the second room available for assistance who were kept on duty that evening. Most had pick handles.

132. In Room 2 prisoners were ordered by Hudson and other officials to say "Yes sir" or "No sir" in response to questions.

133. In Room 2 all prisoners were told to strip and were given a body search which included a search of their hair and all body cavities. All prisoners were then issued new clothing and escorted to cells.

134. A strip search is standard procedure when prisoners arrive at a federal institution like Lewisburg.

135. The procedure used for the strip searches required that Plaintiffs' arms be held out perpendicularly to their torsos against a wall. Some Plaintiffs' arms were held to the wall by pick handles while the search was conducted.

136. At least two guards accompanied each prisoner to a cell.

137. No prisoner created any problems while being taken to his cell.

138. Prisoners were kept three to a cell.

139. The cells were designed for two prisoners. There are only two bunks. The third prisoner in each cell was obliged to sleep on a mattress on the floor.

140. At about 8:00 P.M. on April 14, 1978, a bus carrying twenty-five federal prisoners (Bus 2) and three armed correctional officers arrived at the U.S. Penitentiary at Lewisburg, Pennsylvania. (U)

141. Among the twenty-five on the second bus the following are plaintiffs in this Federal Tort Claims Act action:

Allen Benton

Harold Boggins

Charles Brooks

Billie Austin Bryant

Richard McCue

Richard Montgomery

Henry Sheeley

Bobby Joe Smith

142. When Bus 2 arrived Fenton had it stopped inside the sally port at the rear gate under the observation of several officers until the prisoners in Bus 1 were processed.

143. Based on the reports from the officers Fenton did not expect any problems from the prisoners on Bus 2.

144. However, when correctional officers boarded Bus 2 to call off the first 6–8 prisoners, they perceived a tense atmosphere on the bus.

145. Fenton then decided that the inmates on Bus 2 should be processed like those on Bus 1.

146. With the exception of the orderlies on the second bus, who were not issued restraints, all prisoners on the second bus appeared to be in handcuffs and waist-chains and almost all were wearing leg irons when they came off the second bus.

147. Bus 2 was processed in a slightly different manner from Bus 1. A group of 6 to 8 prisoners was called off the bus by name and ordered to sit on the floor in the first room, to face the wall and to be absolutely quiet.

148. After this first group from Bus 2 was processed, the rest of the prisoners were ordered off the bus into Room 1 and ordered to stand facing the wall in the first room.

149. Initially the prisoners on Bus 2 were processed like those on Bus 1. Later they were processed from Room 1 to Room 2 two at a time and finally three at a time.

150. Once in Room 2, the prisoner Plaintiffs from Bus 2, with the exception of Sheeley, were stripped, searched and escorted to cells in the same way as the prisoners from Bus 1.

151. Correctional officers forcibly removed at least six prisoners from Room 1 to Room 2. (U).

152. All the Plaintiffs except Ozgur forcibly removed to Room 2 were wearing handcuffs, waistchains and leg irons when they were removed.

153. Three of the six prisoners forcibly removed from Room 1 and taken to Room 2 were Plaintiffs Cook, Picariello, and Sheeley, all of whom violated orders in Room 1.

154. Plaintiff Picariello while in Room 1 demanded that his shackles be taken off and cursed the officers. Correctional Officer Noone and another officer carried Picariello into Room 2 by lifting him up under the arms and dragging him backwards.

155. Picariello was struggling, cursing and abusive to the two officers carrying him.

156. Hudson ordered the officers to put Picariello in a prone position, face down, in order to make it more difficult for him to get up.

157. Hudson ordered two officers to stand guard over Picariello to keep him quiet and later reduced the guard to one officer. For about one hour Picariello was forced to lie on the floor, face down, with his hands in handcuffs underneath him while Correctional Officer Butler rested a pick handle on his back. Correctional Officer Kindt relieved Butler in the role of holding a pick handle on Picariello's body.

158. No pressure was applied with the handle except when Picariello tried to stand up at which time the correctional officer applied enough pressure to push Picariello back to the floor.

159. After the other prisoners were processed, Picariello was processed in the same manner as the rest without incident.

160. Sheeley while in Room 1 started yelling and refused to be quiet. Kerstetter signalled to Geiswite to remove Sheeley.

161. Sheeley was then lifted up under the arms by Geiswite and another officer. Although in restraints, Sheeley began to struggle and several other officers helped subdue him. In so doing Sheeley and at least one officer fell to the floor.

162. Sheeley was originally placed in a sitting position on the floor in Room 2.

163. Sheeley was subsequently placed on his stomach while in his restraints and a correctional officer rested his pick handle on Sheeley's back.

164. Hudson ordered Plaintiff Sheeley to be placed in a prone position, face down, so that he could not get up quickly if he wanted to be disruptive.

165. After the officers concluded that Sheeley would not be disruptive he was allowed to stand and was processed in the usual manner without incident.

166. Plaintiff Cook while in Room 1 became restless and began talking. He was carried into Room 2 by two officers who lifted him under his arms. He was paced in a sitting position on the floor in Room 2 and then processed without incident.

167. One of the other options for processing the prisoners who were said to have acted out in Room 1 was to place them in a holding cell and to remove their restraints later. This option was not utilized.

168. Fenton believed that it would have required too much manpower and time to take disruptive inmates to a holding cell and supervise them there.

169. Plaintiff Casson Glick arrived at Lewisburg on Bus 1.

170. After being stripped and searched, the handcuffs and the leg irons were replaced on Glick by Hudson.

171. Hudson placed restraints on Glick because Hudson and Cassella knew Glick from an incident in 1967 at the United States Penitentiary at Leavenworth in which Glick and others had attacked officers and Hudson had great difficulty placing Glick in his cell at that time.

172. In addition, Humme told Hudson that Glick was out of his leg irons on the bus.

173. Cassella, who was involved in the decision to put the restraints back on Glick, believed Glick should be placed in restraints on April 14, 1978 because of Glick's surly appearance, natural leadership qualities, superior strength, large size, ability to compromise restraints, participation in a riot in Atlanta as well as the 1967 Leavenworth incident.

174. Cassella was worried that Glick and two other inmates could batter down a wooden cell door on the second or third floor. Therefore, Glick was placed in a cell in the basement which had metal doors.

175. Fenton approved the decision to put Glick in his cell in restraints.

176. Because of the fact that the buses were not being processed in a normal manner, Medical Technical Assistant (MTA) Lampman did not carry out the procedure usually followed upon arrival of buses which involves rather extensive questioning of prisoners about such matters as their medication, glasses, and a brief medical history.

177. Lampman had been ordered by Assistant Hospital Administrator Kelley to expedite the processing by deviating from the usual procedure.

178. No prisoner was thoroughly examined by any medical personnel the evening of April 14, 1978 or the next morning before the buses left Lewisburg.

179. Lampman asked some of the prisoners if they had any medical problems. He questioned the prisoners either as they were being strip-searched or immediately thereafter in the presence of several guards armed with pick handles.

180. No Plaintiff asked for medical attention and none appeared to Lampman to require any.

181. On the night of April 14, 1978, Plaintiff Richard Montgomery was not in restraints in his cell.

182. The segregation cellblock during the night of April 14, 1978 was quiet and uneventful.

183. All but six of the Plaintiffs who arrived at Lewisburg on April 14, 1978, aboard the two buses were designated to proceed to other penal institutions. .

184. The next morning the Plaintiffs and other prisoners who were leaving Lewisburg were strip-searched and bound in restraints by correctional officers, some of whom were dressed in riot gear and carried pick handles.

185. On the morning of April 15, 1978, no plaintiffs had their handcuffs or leg irons put on with excessive tightness.

186. Some Plaintiffs' restraints on April 15, 1978 were covered with adhesive tape to prevent tampering with the locking mechanisms.

187. Some Plaintiffs had black boxes placed over their handcuffs.

188. A black box prevents tampering with the locking mechanism of the handcuffs.

189. On the morning of April 15, 1978, Lt. Scott was responsible for placing restraints on some plaintiffs for their bus trip to Terre Haute.

190. The Plaintiffs who left Lewisburg on April 15, 1978, left without incident.

191. On April 16, 1978, when Cozza delivered an incident report to Glick charging Glick with tampering with his handcuffs, Glick threatened to kill "one of the police" and told Cozza he had better not remove the restraints because he would "kill a cop."

192. Glick was kept shackled and handcuffed from the night of April 14, 1978 until April 17, 1978. It was very difficult

for him to rest or take care of personal needs such as bowel movements during that period.

193. On April 17, 1978 Hudson removed Glick's restraints when Glick gave Hudson his assurance that there would be no trouble.

194. No contraband was found at Lewisburg on any prisoner who was aboard either of the buses on April 14, 1978. (U)

195. No prisoner on either bus was given an incident report for any misconduct occurring while at Lewisburg on April 14 or April 15, 1978 when the prisoners left Lewisburg.

196. Bureau of Prisons discipline policy allows a disciplinary hearing (IDC hearing) to take place at a transferee institution if the prisoner is transferred at which written statements may be introduced as evidence against the prisoner, rather than live testimony.

197. Incident reports were not prepared for any Plaintiff other than Glick who violated rules because most Plaintiffs were leaving on April 15, 1978 for other institutions and Lewisburg officials believed it was not worth the time to prepare charges by reason of the paper work required for IDC hearings at the transferee institutions.

198. No Plaintiff was struck by a fist or pick handle or kicked by any officer on April 14 or April 15, 1978.

199. No Plaintiff asserting a tort claim against the United States suffered any physical or emotional injury on April 14, 1978 or April 15, 1978.

200. With the exception of the placement of leg irons and handcuffs on Glick for a period of approximately three days while he was confined to a cell, the measures used by prison officials on April 14 or April 15, 1978 were reasonable under the circumstances.

201. Glick's threats on April 16, 1978 were caused by the fact that he had been kept in restraints in his cell from April 14, 1978 to April 16, 1978.

202. The sum of $200.00 will fully and fairly compensate Glick for the discomfort, humiliation and inconvenience of being tortiously confined in a cell while in restraints.

### III. Discussion.

The United States concedes that the alleged wrongful acts complained of by the Plaintiffs were committed by employees of the United States while acting within the scope of their employment. Consequently, this Court has jurisdiction to award damages "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The United States also concedes that the employees of the Federal Bureau of Prisons involved in the events of April 14, and April 15, 1978 at Lewisburg were investigative or law enforcement officers. This Court, therefore, has jurisdiction to award damages for any claim arising out of an assault or battery by any of such persons on the Plaintiffs. 28 U.S.C. § 2680(h).

█ Turning first to the allegations of assault, the Court is of the view that no Plaintiffs are entitled to recover under that theory. Under Pennsylvania law which is the applicable law, see 28 U.S.C. § 1346(b), an assault is "*an act* intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery." *Cucinotti v. Ortmann*, 399 Pa. 26, 27, 159 A.2d 216, 217 (1960) (emphasis in the original). With the exceptions of Plaintiffs Cook, Picariello, Sheeley, and Glick, all of whom will be considered separately, none of the Plaintiffs was ever under a reasonable apprehension of an immediate battery.

The presence of pick handles was, under the circumstances, reasonable in light of the fact that Fenton reasonably believed that the prisoners were able to compromise their restraints. In any event, in order for there to be an assault, the actor must be in a position to inflict the battery and he must take some affirmative action to do so. *Cucinotti v. Ortmann*, 399 Pa. 26, 27, 159 A.2d 216 (1960). The Court has found that no

Plaintiff was threatened with a pick handle and that no threats were made by any correctional officers on April 14 or April 15, 1978. Plaintiffs, therefore, were not assaulted while at Lewisburg.

■ The Court is also of the view with the exception of Plaintiffs Cook, Picariello, Glick and Sheeley, none of the Plaintiffs was subject to a battery by correctional officers while at Lewisburg. A battery is any offensive contact however minor. Restatement (Second) of Torts § 13; *Kedra v. City of Philadelphia*, 454 F.Supp. 652, 672 (E.D.Pa.1978). While it is true that each Plaintiff was touched by employees of the United States while at Lewisburg, these touchings do not constitute batteries. Some Plaintiffs, for example, were helped to their feet and escorted from Room 1 to Room 2. While being stripped and searched in Room 2, Plaintiffs were of necessity touched by correctional officers. In addition, while being escorted to their cells in the evening and from their cells in the morning, Plaintiffs were touched. All of the Plaintiffs who left Lewisburg were placed in restraints on the morning of April 15, 1978. These acts, however, while perhaps offensive to the Plaintiffs, were not batteries. The incidental and necessary touchings by correctional officers of inmates in the performance of their duties are not batteries, but are privileged contacts. Restatement (Second) of Torts § 132, Comment b (1965); *see Kedra v. City of Philadelphia*, 454 F.Supp. 652, 673 n. 22 (E.D.Pa.1978).

■ With respect to Plaintiffs Picariello and Sheeley, the Court is of the view that the technical assaults and batteries committed upon them in removing them from Room 1 and placing them face down on the floor in Room 2 were privileged. Plaintiffs do not argue that every offensive touching of an inmate is a battery or that a reasonable apprehension of such a touching is an assault. They recognize that officials charged with the custody of prisoners are privileged to use force which is reasonable under the circumstances to maintain control of their charges. Plaintiffs argue, however, that the placement of Picariello and Sheeley on the floor face down while in restraints was unnecessary and, therefore, not privileged.

The Court is unable to accept that conclusion. Both Picariello and Sheeley refused to obey reasonable orders in Room 1. Both resisted their removal from Room 1 to Room 2. While by hindsight the Court has the luxury of knowing that in fact no disturbance occurred that night at Lewisburg, Fenton's decision to place disruptive inmates on the floor in Room 2 was reasonable. It eliminated the need either thoroughly to search prisoners who were just prior to their removal from Room 1 unruly before placing them in cells or to place them in a holding area outside Room 2 under the supervision of one or more guards. That, in addition to taking more time, would have reduced the number of officers present in Room 2. Although placement on the floor in the positions assumed by Picariello and Sheeley was uncomfortable, the Court is of the view that it was not so uncomfortable as to make the conduct of Hudson who actually ordered that they be placed face down and of Fenton unreasonable and therefore a battery.

Cook was removed from Room 1 because he was visibly uncomfortable and began to talk. It was, therefore, reasonable to remove him. The force used to do so was not excessive. He was not placed face down on the floor, but was immediately searched and taken to a cell. The Court concludes that the technical assault and battery on Cook was privileged.

■ The Court concludes that Plaintiff Glick was subjected to a battery by being confined in restraints in his cell for an extended period. The Court is of the view that the common law definition of battery, an offensive touching, is sufficiently flexible to describe the placement of restraints on a prisoner. *Cf.* Restatement (Second) of Torts § 132, Comment b (1965) (no privilege to use handcuffs if not reasonable under the circumstances). Such a contact is certainly as offensive as minor touchings which are recognized as batteries. The placement of

restraints on an inmate, of course, would be privileged if that conduct was reasonably necessary in the circumstances. *See* Restatement (Second) of Torts § 132, Comment b (1965). It is the Court's view, however, that the decision to place Glick in his restraints and keep him in that condition in a cell for an extended period, was unreasonable.

In making that determination, the Court is mindful that it is inappropriate to utilize hindsight to reach its decision. The determination of reasonableness must be made at the time Glick was placed in restraints and on the basis of the information available to officials at that time.

Defendants Hudson and Cassella testified as to the reasons Glick was placed in restraints. Glick had been identified by Lt. Humme as the potential ringleader of the disruptive prisoners. This was consistent with Cassella's appraisal of Glick as a natural leader. In addition, both Hudson and Cassella were aware of Glick's great strength and violent tendencies as evidenced by an assault by Glick on correctional officers in 1967. At that time, Hudson with a complement of officers had great difficulty in confining Glick in a cell. Further, Cassella and Hudson were concerned that Glick and two others could batter down the wooden door of a cell on the second or third floor of the special housing unit. They were also concerned that Glick had the ability to compromise restraining equipment.

If Hudson and Cassella were concerned about Glick and two others being able to batter down a wooden door in the segregation unit, the appropriate response would be to place Glick in a basement cell which had metal doors, which was in fact done, and to place him in such a cell alone. There is no evidence which would indicate that Glick and two others would be able to batter down one of the metal cell doors in the basement.

Hudson's and Cassella's concerns of Glick's strength and history of violent behavior likewise are insufficient to support their decision. There is no evidence to indicate that Glick was violent or disruptive once at Lewisburg. There is no testimony that even on the bus when out of his restraints he had taken any other affirmative action to escape. Further, Glick's great strength would not pose any security problem when locked in a cell.

The fact that on April 16, 1978, after having been in his cell in restraints for over 36 hours, Glick threatened to kill an officer if his restraints were removed does not serve to justify the initial decision. Once again, there is no evidence to indicate that Glick was violent at any time from Atlanta to Lewisburg or at Lewisburg. The seriousness of the April 16, 1978 incident was also undermined by the fact that on April 17, 1978, Hudson ordered Glick's restraints removed upon receiving Glick's assurance that there would be no trouble. Hudson testified that having known Glick for 12 years he could accept Glick's word. There is no explanation, however, why Hudson was unwilling to seek Glick's assurance on April 14, 1978 when the decision was made to place him in restraints.

Glick's surly appearance does not justify the decision. Glick's appearance, in the absence of a belief on Hudson's or Cassella's part that he was going to become violent, is not relevant. Many prisoners, no doubt, look surly, but the appearance of an inmate cannot justify a decision to place restraints on him and keep him so restrained for 36 hours before re-evaluating the situation.

In the absence of any evidence that Hudson or Cassella feared an outburst by Glick, the fact that he was a strong individual does not warrant the treatment he received. Similarly, his natural leadership abilities when added to his strength and violent history do not support the decision. Since Glick could be securely locked in a cell, his leadership abilities would be limited to yelling on the tier. His placement in handcuffs and leg irons, however, did nothing to prevent that from occurring.

Glick's ability to compromise restraints is also irrelevant. There was no evidence that Glick was capable of opening the locked door of his basement cell. Since Glick could

be securely locked in a cell, he would have no opportunity to use his skill to compromise restraints. In any event, it is not at all clear how his ability to compromise restraining equipment would be of any use to Glick if he was not wearing any and if no one in his cell was.

It is the Court's view that Glick was kept in restraints in his cell for 36 hours without a reevaluation of the situation because Hudson and Cassella believed Glick had the ability to cause problems on the tier if he chose to do so and they determined that the use of restraints would dissuade him from doing so. At that time, however, they did not believe that Glick was intending to cause trouble once he reached his cell. While their fears might have justified a decision to keep Glick in restraints over night, those fears did not justify keeping Glick in that condition until Sunday when Cozza delivered to Glick an incident report relating to tampering with his handcuffs and leg irons on the bus. Once Glick made the threat to kill an officer if the restraints were removed, it was reasonable to keep him restrained until the prison officials were convinced Glick would behave. The Court has searched the record for evidence to support the decision to place Glick in restraints for the initial 36-hour period and finding none must conclude that that action was unreasonable and tortious.

■ The Government takes the position that more is required to impose liability upon the Government under the Federal Tort Claims Act than a finding that a tort was committed by a governmental employee in the course of his duties. The Government argues that a recovery against the United States is appropriate only if the individuals who committed the tortious acts could be found liable for monetary damages because of their failure to establish the qualified immunity recognized by the Supreme Court in *Wood v. Strickland*, 420 U.S. 308, 313–22, 95 S.Ct. 992, 996–1000, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes*, 416 U.S. 232, 238–49, 94 S.Ct. 1683, 1687–92, 40 L.Ed.2d 90 (1974) and *Procunier v. Navarette*, 434 U.S. 555, 561–62, 98 S.Ct. 855, 859,

55 L.Ed.2d 24 (1978) which extended the qualified immunity to prison officials. The Government points to *Norton v. United States*, 581 F.2d 390 (4th Cir.) *cert. denied*, 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 678 (1978), in support of this argument. It is the Court's view, however, that in certain respects *Norton* is distinguishable and, to the extent that it is not, the Court finds more persuasive the district court's decision in *Norton v. Turner*, 427 F.Supp. 138 (E.D. Va.1977), *rev'd sub nom. Norton v. United States*, 581 F.2d 390 (4th Cir.), *cert. denied*, 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 678 (1978).

*Norton* involved the United States's liability for actions which were found by the District Court to have violated the Fourth Amendment. In that context, the United States Supreme Court has held that officials enjoy qualified immunity from liability for monetary damages for actions taken in violation of the Constitution. *See Wood v. Strickland*, 420 U.S. 308, 3113–22, 95 S.Ct. 992, 996–1000, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes*, 416 U.S. 232, 238–49, 94 S.Ct. 1683, 1687–92, 40 L.Ed.2d 90 (1974). This immunity, which is a matter of federal law, is required in order to insure that officials charged with executing the laws and performing public functions do so vigorously without being unduly concerned that their good faith actions will subject them to liability. *Scheuer v. Rhodes*, 416 U.S. 232, 240, 94 S.Ct. 1683, 1688, 40 L.Ed.2d 90 (1974).

Plaintiffs in this phase of the case seek compensation from the United States not for constitutional deprivations but for common law deprivations. Under the common law, a principal may not rely upon an agent's immunity from civil liability to escape his own responsibility. Restatement (Second) of Agency § 217(b)(ii)(1958). In addition, the policy reasons underlying the qualified immunity doctrine—the decision that it is better for officials to make good faith errors then unduly to chill them in the execution of their duties—does not apply in this case. No individual faces monetary liability if the individual's good faith de-

fense does not inure to the benefit of the Government.

The Supreme court's decision in *Owen v. City of Independence, Missouri,* —— U.S. ——, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) concluded that the Government cannot rely on an employee's good faith immunity to escape liability in an analogous situation. In that case, the City of Independence argued that it could not be liable for damages in a § 1983 action if its agents acted in good faith. The Court rejected this argument for a number of reasons. The Court noted that the imposition of liability on the city would not chill officials in the exercise of their duties because the officials are not exposed to personal liability if they act in good faith. *Owen v. City of Independence, Missouri,* —— U.S. ——, —— & n. 37, 100 S.Ct. 1398, 1416 & n. 37, 63 L.Ed.2d 673 (1980).

The Court rejected the argument that the city's sovereign immunity was a ground for immunity in a § 1983 action. Because sovereign immunity protects a city from all suits except those to which it consents, the "presence or absence of good faith is simply irrelevant." *Owen v. City of Independence, Missouri,* —— U.S. ——, ——, 100 S.Ct. 1398, 1413, 63 L.Ed.2d 673 (1980). The enactment of § 1983 stripped the city of whatever sovereign immunity it might have enjoyed. Similarly, the enactment of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2680(h) waived the sovereign immunity of the United States in this case.

The Supreme Court in *Owen* also noted that policy considerations warranted its holding that a municipality does not enjoy a good faith immunity in § 1983 actions. Among them was that "the threat that damages might be levied against the city may encourage those in a policymaking position to institute internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights." *Owen v. City of Independence, Missouri,* —— U.S. ——, ——, 100 S.Ct. 1398, 1416, 63 L.Ed.2d 673 (1980), (footnote omitted). The imposition of liability on the United States in this case may likewise encourage policymakers to take steps to reduce the chances that activities like those of Fenton, Hudson, and Cassella in placing and keeping Glick in his cell while in restraints will occur in the future.

The distinction must be drawn, however, between the personal immunity of correctional officials in some cases and the privilege they have to commit acts which would otherwise amount to batteries. The Restatement (Second) of Torts, § 10(2) provides that a privilege may be based upon:

> (b) the fact that its exercise is necessary for the protection of some interest . . . of the public which is of such importance as to justify the harm caused or threatened by its exercise, or

> (c) the fact that the act is performing a function for the proper performance of which freedom of action is essential.

If a defendant successfully establishes a privilege, a plaintiff's claim for relief has failed. That is because in the circumstances of the case that which the actor did was in the view of the law necessary and outweighs the harm caused to the plaintiff. In such a circumstance, it is reasonable for someone derivatively liable for an actor's actions to enjoy the privilege. That is because the law determines that the activity conducted by the actor was lawful. Thus, in this case, a correctional officer is privileged to use reasonable force necessary to carry out his duties and that amount of force when applied to a prisoner is not tortious.

That is not the case when an immunity is involved. Unlike a privilege, which looks at the action taken by the actor, the question of immunity focuses on the actor's responsibility for the action. The finding that an actor is immune from payment of damages does not in any sense justify the action taken. Rather, such a finding for reasons of policy excuses that actor from having to compensate the injured party. The fact that a particular actor is immune does not, as in the case of privileged action, represent a determination that the conduct committed was appropriate. On the contrary, it recognizes that the conduct was inappropriate

but shields that particular actor from immunity. The Court, therefore, concludes that the United States may not avail itself of the good faith immunity of the individual defendants. *See Owen v. City of Independence, Missouri,* —— U.S. ——, ——, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980); *Norton v. United States,* 581 F.2d 390, 397–98 (4th Cir.) (Butzner, J., dissenting); *cert. denied,* 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 678 (1978); *Downs v. United States,* 522 F.2d 990, 998 (6th Cir. 1975) (dicta); *Norton v. Turner,* 427 F.Supp. 138, 151–52 (E.D.Va.1977), *rev'd sub nom., Norton v. United States,* 581 F.2d 390 (4th Cir.), *cert. denied,* 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 678 (1978).

■ Plaintiffs also claim they are entitled to damages pursuant to 18 U.S.C. § 4042(2) which requires the Bureau of Prisons to "provide suitable quarters and provide for the safekeeping, care, and sustenance of all persons . . . convicted of offenses against the United States . ." and 18 U.S.C. § 4042(3) which provides that the Bureau of Prisons shall provide inmates with protection. These sections have supported an award of damages against the United States when one inmate was injured by another inmate in circumstances in which negligence on the part of Bureau of Prisons employees has been established. *Brown v. United States,* 342 F.Supp. 987 (E.D.Ark.1972), *aff'd. in part and rev'd. in part on other grounds,* 486 F.2d 284 (8th Cir. 1973). On the other hand, liability is not appropriate unless the negligence of officials is proven. *Crump v. United States,* 534 F.2d 72 (5th Cir. 1976); *Jones v. United States,* 534 F.2d 53 (5th Cir.), *cert. denied,* 429 U.S. 978, 97 S.Ct. 487, 50 L.Ed.2d 586 (1976). Plaintiffs have cited no case, however, in which liability has been imposed when the harm was inflicted intentionally by employees of the United States. There is no reason to assume, however, that the United States would not be liable in such a situation. Liability will not attach to the United States on the basis of 18 U.S.C. § 4042 because it is the Court's view that the agents of the United States were not negligent on April 14 and April 15, 1978.

The fact that Defendants Hudson and Cassella put restraints on Glick while he was in his cell for three days does not indicate that the agents of the Bureau of Prisons did not exercise ordinary care to provide for the safekeeping of Glick. While his placement in confinement in restraints had the approval of the Warden, the lack of any actual physical injury to Glick precludes recovery against the United States for negligence. In any event, Glick is entitled to recover only damages to compensate him for his confinement in a cell while in restraints. The measure of damages is the same regardless of the theory supporting liability. Therefore, a finding of liability under 18 U.S.C. § 4042 would not increase the amount of damages to which Glick is entitled.

■ Plaintiffs also claim they are entitled to damages because of intentional infliction of emotional distress. Pennsylvania recognizes this tort, *See Forster v. Manchester,* 410 Pa. 192, 199, 189 A.2d 147 (1963) and has adopted the definition of the tort set forth in the Restatement (Second) of Torts § 46 (1965) which provides:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability . ' . . . .

No physical impact is required in order for there to be recovery. *See Niederman v. Brodsky,* 436 Pa. 401, 403, 261 A.2d 84 (1970). Plaintiffs have not shown by a preponderance of the evidence that the conduct of the Defendants was extreme and outrageous or that any Plaintiffs suffered severe emotional distress.

The plan devised by Warden Fenton and implemented by his staff on April 14, 1978 was a reasonable response to the actions of the inmates in transit. There was nothing extreme or outrageous about lining the steps leading from the bus to the prison buildings with officers in riot gear carrying pick handles in light of the fact that there was a serious question in Fenton's mind whether the prisoners coming off the buses were securely restrained. It was also rea-

sonable to have the prisoners sit on the floor facing the wall in silence in Room 1, to be processed one at a time in Room 2 and then to be escorted to cells. Likewise, the presence of officers in riot gear and with pick handles on April 15, 1978 was not extreme and outrageous under the circumstances. Since the conduct of the officials at Lewisburg was not extreme and outrageous, the Plaintiffs have failed to establish one key element for a claim of intentional infliction of emotional distress.

Plaintiffs have also failed to establish that any of them suffered severe emotional distress as the result of the events of April 14 and April 15, 1978. Although many Plaintiffs testified that they were scared on April 14, 1978 and that they still suffer some effects from their experience, it is the Court's view that none of the Plaintiffs has suffered any severe emotional distress as the result of the events at Lewisburg which are in question. Consequently, even if the Defendants' conduct was extreme and outrageous, Plaintiffs are not entitled to recover under a theory of intentional infliction of emotional distress.

The Court's conclusion that the conduct of the officials at Lewisburg was reasonable extends also to the decision to place Plaintiffs Picariello and Sheeley face down on the floor in Room 2 while in their restraints. As previously stated, both of these individuals had refused to obey orders in Room 1 and struggled as they were removed to Room 2. The placement of them on the floor in Room 2 was reasonable and enabled correctional officers to maintain control over the Plaintiffs without reducing the number of correctional officers present in Room 2 should they be needed. In any event, neither Picariello nor Sheeley suffered severe emotional distress as a result of that treatment.

The decision to place Plaintiff Glick in restraints while he was confined in his cell was not a reasonable one. That conduct, however, was not extreme and outrageous. In any event, the Court finds that Glick did not suffer severe emotional distress as a result of being confined in his cell in re-

straints for three days. Consequently, he is not entitled to recover under the theory of intentional infliction of emotional distress.

■ The Court is also of the view that not one of the Plaintiffs was subjected to willful, wanton, or reckless conduct. As Plaintiffs recognize, in order for conduct to fall within those categories, it must be more than merely unreasonable. *Turek v. Pennsylvania R.R. Co.*, 369 Pa. 341, 343–44, 85 A.2d 845, *cert. denied*, 343 U.S. 928, 72 S.Ct. 762, 96 L.Ed. 1339 (1952); *Fitsko v. Gaughenbaum*, 363 Pa. 132, 134–35, 69 A.2d 76 (1949). The conduct of the individual defendants with respect to the Plaintiffs with the exception of Glick was reasonable. Although the placement of restraints on Glick while he was in his cell for three days was unnecessary, it was not done for the purpose of causing injury and in fact, no injury occurred. A theory of liability based on willful, wanton, or reckless conduct, is, therefore, not available to Glick or other Plaintiffs.

We conclude that only the Plaintiff Glick is entitled to damages under the Federal Tort Claims Act and those damages shall be limited to compensation for improper imposition of restraints while in his cell for three days. The sum of $200.00 will fully and fairly compensate Glick for that conduct.

IV. Conclusions of Law.

1. The Court has jurisdiction over Plaintiffs' claims under the Federal Tort Claims Act.

2. The United States is liable to Plaintiff Glick in the amount of $200.00 for batteries committed upon Plaintiff Glick by Defendants Fenton, Cassella, and Hudson.

3. The United States is entitled to judgment with respect to all other claims asserted by the Plaintiffs.